HANNAH & HOGG v. CLYNE, Dist. Atty., et al.

(District Court, N. D. Illinois, E. D.   November 17, 1919.)

No. 1338.

1. UNITED STATES ⬤⚏125—ACTIONS AGAINST UNITED STATES OFFICER OR AGENT
AN ACTION AGAINST UNITED STATES.

As the government cannot act, save through its duly constituted officers
and agents, a suit to enjoin an officer or agent from enforcing a federal
statute is clearly a suit against the United States; but officers or agents
purporting to act under an unconstitutional law go beyond their lawful
functions, and a suit to enjoin them from acting under an unconstitutional
law is not treated as one against the United States.

2. INTOXICATING LIQUORS ⬤⚏6—EXCLUSIVE POLICE POWER OF STATES TO REG-
ULATE SALE AND DISPOSITION.

Aside from the distinctive war powers of Congress, the states under
Const. Amend. 10, before the Eighteenth Amendment became effective,
had exclusive police power to regulate the sale of intoxicating liquors,
etc., within their borders.

3. WAR ⬤⚏2—BROAD CONSTRUCTION OF SECTION GIVING CONGRESS GENERAL
POWER TO CARRY INTO EFFECT POWERS SPECIFICALLY GIVEN.

Const. art. 1, § 8, after providing that Congress shall have power to
declare war, raise and support armies, etc., provides in clause 18, that it
shall have power to make all laws necessary and proper to carry into
execution the foregoing powers. *Held*, that the latter clause should be
liberally construed to meet every emergency related to the carrying on of
war; the test being whether what was done by Congress was in the inter-
est of the general welfare of the country.

4. INTOXICATING LIQUORS ⬤⚏2½, New, vol. 8A Key-No. Series—CONGRESS HAS
POWER TO DECLARE WAR-TIME PROHIBITION.

The War Prohibition Act of November 21, 1918, is a valid exercise of
the war powers of Congress.

5. CONSTITUTIONAL LAW ⬤⚏70(3)—WISDOM OF LEGISLATION NOT JUDICIAL
QUESTION.

The wisdom of statutes is a question exclusively for the Legislature,
and the courts cannot substitute their judgment for that of the legislative
department.

6. INTOXICATING LIQUORS ⬤⚏132—WAR PROHIBITION ACT EFFECTIVE DESPITE
CONTENTION THAT EMERGENCY HAD PASSED.

The War Prohibition Act of November 21, 1918, providing that after
June 30, 1919, until the conclusion of the present war, and thereafter
until termination of demobilization, it shall be unlawful to sell any dis-
tilled spirits, etc., together with provisions for its enforcement found in
the National Prohibition Act of October 28, 1919, cannot be deemed to
have expired by limitation toward the close of the year 1919, because
active hostilities had long since ceased and the armed forces had been
practically demobilized, for it is obvious that, as Congress passed the act
after the Armistice had been signed, it intended it to be effective during
the period of readjustment which would necessarily follow the end of
active hostilities.

7. EMINENT DOMAIN ⬤⚏2(1)—PROHIBITION AS TO LIQUOR NOT TAKING OF PROP-
ERTY WITHOUT COMPENSATION.

War Prohibition Act Nov. 21, 1918, together with provisions for its en-
forcement found in National Prohibition Act Oct. 28, 1919, though they
destroy the value of whisky and other intoxicating liquors, which un-
doubtedly are property, are not subject to attack under Const. Amend. 5,
on the ground that they deprived the owners of intoxicating liquors of
their property without just compensation, for such statutes are an exer-

⬤⚏For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cise of the police power, and every citizen holds his property subject to the exercise of such power.

8. INTOXICATING LIQUORS ☞13—WAR-TIME PROHIBITION NOT RENDERED IN-VALID BY ADOPTION OF PROHIBITORY AMENDMENT.

The ratification of the Prohibitory Amendment (Const. Amend. 18), which gave a period of one year from the date of ratification, did not render ineffectual the War Prohibition Act, which became effective June 30, 1919, practically six months before the Prohibitory Amendment became effective, on the theory that persons engaged in liquor traffic were entitled to one year in which to wind up their business, for the Prohibitory Amendment, when it became a part of the Constitution, in no way infringed on the war powers already conferred on Congress.

9. CONSTITUTIONAL LAW ☞48—STATUTES MUST BE ASSUMED TO BE RESULT OF WISE POLICY.

The courts must assume that statutory enactments, such as War Prohibition Act Nov. 21, 1918, are wise.

10. INJUNCTION ☞137(1)—ENFORCEMENT OF WAR-TIME PROHIBITION WILL NOT BE STAYED BY PRELIMINARY INJUNCTION.

Enforcement of War Prohibition Act Nov. 21, 1918, and the provisions of National Prohibition Act Oct. 28, 1919, for its enforcement, will not be temporarily enjoined pending an appeal by parties defeated in a suit to enjoin enforcement of the acts, for irreparable injury might be worked if the acts should ultimately be held valid, and liquor dealers be given a period in which to dispense of their stocks to the public.

In Equity. Bill by Hannah & Hogg against Charles F. Clyne, District Attorney for the Northern District of Illinois, and Julius F. Smietanka, Collector of Internal Revenue for the First Collection District of Illinois. On motion for preliminary injunction and counter motion to dismiss the bill. Motion for preliminary injunction denied, and motion to dismiss bill granted.

After allegations sufficient to confer jurisdiction upon this court, the bill charges:

That on November 21, 1918, there was enacted by Congress and approved by the President of the United States the so-called War Prohibition Act (chapter 212, 40 Stat. 1046, 1047), containing the following provisions:

"That after June 30, 1919, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, for the purpose of conserving the man power of the nation, and to increase efficiency in the production of arms, munitions, ships, food, and clothing for the army and navy, it shall be unlawful to sell for beverage purposes any distilled spirits, and during said time no distilled spirits held in bond shall be removed therefrom for beverage purposes except for export." And further that: "Any person who violates any of the foregoing provisions [which includes the provision hereinabove set forth] shall be punished by imprisonment not exceeding one year, or by fine not exceeding $1,000, or by both such imprisonment and fine."

That the National Prohibition Act was passed by both houses of Congress, and on October 19, 1919, presented to the President of the United States; that on October 27, 1919, it was returned to Congress by the President with his objections and veto; and that afterwards, and on October 28, 1919, the bill was passed over the President's veto by the necessary two-thirds vote of each house.

That title 1 of the National Prohibition Act (Act Oct. 28, 1919, c. 85, §§ 2–5) provides, among other things:

"The Commissioner of Internal Revenue, his assistants, agents, and inspectors, shall investigate and report violations of the War Prohibition Act

to the United States attorney for the district in which committed, who shall be charged with the duty of prosecuting, subject to the direction of the Attorney General, the offenders as in the case of other offenses against laws of the United States."

"The Commissioner of Internal Revenue, his assistants, agents, and inspectors, and all other officers of the United States whose duty it is to enforce criminal laws, shall have all the power for the enforcement of the War Prohibition Act or any provisions thereof which is conferred by law for the enforcement of existing laws relating to the manufacture or sale of intoxicating liquors under the laws of the United States."

"Any room, house, building, boat, vehicle, structure, or place of any kind where intoxicating liquor is sold, manufactured, kept for sale, or bartered in violation of the War Prohibition Act, and all intoxicating liquor and all property kept and used in maintaining such a place, is hereby declared to be a public and common nuisance, and any person who maintains or assists in maintaining such public and common nuisance shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not less than $100 nor more than $1,000, or be imprisoned for not less than thirty days or more than one year, or both."

"The United States attorney for the district where such nuisance as is defined in this act exists, or any officer designated by him or the Attorney General of the United States, may prosecute a suit in equity in the name of the United States to abate and enjoin the same."

The bill further charged:

That the United States on April 6, 1917, declared "that a state of war exists between the Imperial German Government and the government of the people of the United States." That the war continued with actual combat until November 11, 1918, when an armistice was officially declared and established. That the United States through its various departments, since the date of the Armistice, has completely suspended and abandoned all its wartime activities in the production of arms, munitions, ships, food, and clothing for the army and navy, and also has disposed of in excess of $2,000,000,000 in value of stores accumulated for the successful prosecution of the war.

That on July 14, 1919, the War Trade Board Section of the Department of State officially announced the resumption of trade with Germany. That the Federal Reserve Board simultaneously officially announced the resumption of exchange with Germany. That on the same day the War Trade Board Section further officially announced that all commodities had been removed from the export conservation list. That there are now no restrictions upon trade between the United States and those countries with which it and the Allied Governments had been at war. That all censorship of postal, telegraphic, and wireless communication between the United States and those countries was removed on June 21, 1919. That demobilization of the armed forces of the United States has been terminated.

That on November 11, 1918, the President of the United States, in addressing a joint meeting of the two houses of Congress, after summarizing the terms of the armistice, said: "The war thus comes to an end; for, having accepted these terms of armistice, it will be impossible for the German command to renew it. * * * We know, too, that the object of the war is attained, the object upon which all free men had set their hearts, and attained with a sweeping completeness which even now we do not realize."

That on September 30, 1919, the War Department officially announced that "in general the accident of war and the progress of demobilization are at an end," that the army and navy were below their peace time strength, and that recruits were being sought for both.

That the message of the President of the United States vetoing the National Prohibition Act, among other things, stated: "It has to do with the enforcement of an act which was passed by reason of the emergencies of war and whose objects have been satisfied in the demobilization of the army and navy, and whose repeal I have already sought at the hands of Congress. Where the purposes of particular legislation arising out of war emergency have been satisfied, sound public policy makes clear the reason and necessity for repeal."

That on July 10, 1919, the President of the United States submitted to the Senate the Treaty of Peace with Germany, which he had theretofore, in co-operation with the representatives of the Allied nations, negotiated at Paris, France, and that treaty is now under consideration.

That on December 3, 1917, Congress adopted and submitted to the Legislatures of the several states a joint resolution proposing the adoption of an amendment to the Constitution of the United States, known as the Prohibition Amendment, and which amendment prohibits the manufacture, sale, or transportation within, or the importation into or the exportation from the United States and all territory subject to its jurisdiction of intoxicating liquors for beverage purposes, one year after its date of ratification by the states. That on January 29, 1919, an official proclamation was made by the acting Secretary of State to the effect that the amendment had been adopted.

That the plaintiff does an annual business of over $2,000,000, and has been engaged in distilling, manufacturing, storing, distributing, buying, and selling whisky, alcohol, and other distilled spirits for beverage purposes. That it has complied with all of the laws of the United States, and all of the internal revenue regulations made under or pursuant thereto, and has always duly paid the special tax or license fee required by law to be paid by it as a rectifier of and a wholesale and retail dealer in intoxicating liquors.

That the defendants have publicly threatened to enforce the provisions of the War and National Prohibition Acts, and to bring numerous criminal prosecutions, as well as civil suits to enforce the same, and have notified the plaintiff that, if it sells or attempts to sell any of its floor stock, the property so sold and purchased will be confiscated, and that the defendants would enforce against the plaintiff, its officers, salesmen, and agents, the various pains and penalties specified in the law.

Plaintiff asks that the court by its decree declare unconstitutional both the War Prohibition Act and title 1 of the National Prohibition Act, and grant a temporary injunction or other appropriate relief, to the end that the plaintiff may be immediately restored to the use and benefit and the right of sale in the United States for beverage purposes of its 6,261.13 gallons of floor stock whisky, pending final hearing. It also prays for general relief.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill. (Levy Mayer, of Chicago, Ill., of counsel), for plaintiff.

Charles F. Clyne, U. S. Dist. Atty., and Frederick Dickinson, Asst. U. S. Dist. Atty., both of Chicago, Ill., for defendants.

Before CARPENTER and FITZHENRY, District Judges.

CARPENTER, District Judge (after stating the facts as above). Defendants object to the form of action on three grounds: First, the suit is in effect one against the United States, and the United States has not given its consent to be sued; second, a court of equity cannot entertain jurisdiction to enjoin the enforcement of a criminal statute; third, a court of equity cannot restrain the United States attorney from performing his statutory duty. Defendants also move to dismiss for want of equity.

[1] A government cannot act, save through its duly constituted officers and agents, and a suit, therefore, against an officer or agent of the government specially charged by law with the enforcement of the federal statutes, clearly is a suit against the United States. Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399. The relief sought is to prevent action on the part of the United States, and if granted binds the United States as effectively as if it were named as a defendant.

There is, however, a well-defined exception with reference to suits against government officers. Wherever those officers purport to act under an unconstitutional law, or, acting under a constitutional law, go beyond the scope of their power, and irreparable injury will result to the plaintiff if the injunction does not issue, such officers may be enjoined. Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764.

[2] This brings us to the question whether the War Prohibition Act and the National Prohibition Act are a constitutional exercise of the legislative powers of Congress. The Tenth Amendment of the Constitution provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

The regulation of the sale of intoxicating liquors within a state is the exercise of police power, and is within the exclusive dominion of the state.

"The general police power is reserved to the states. The power to protect the public health and the public safety, to preserve good order and the public morals, to protect the lives and property of their citizens; the power to govern men and things within the limits of their dominions by any legislation appropriate to that end, and which does not encroach upon the rights guaranteed by the national Constitution nor come in conflict with the acts of Congress passed in pursuance of that instrument—is a power originally and always belonging to the states, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States." 9 Encyclopedia of U. S. Supreme Court Reports, 473.

I have been unable to find, and there has not been furnished to me by counsel, any case holding to the contrary.

In times of peace Congress has no police power of any kind, at any time, anywhere, except over territory which is peculiarly within its jurisdiction, such as the District of Columbia, Alaska, army posts, and other places used solely for governmental purposes. Generally, as a proposition of law, Congress had no power to regulate the selling of intoxicating liquors, much less to restrict or prohibit their disposition within the confines of the several states. In Hammer, United States Attorney, v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, Ann. Cas. 1918E, 724 (decided June 3, 1918), there came before the Supreme Court of the United States an act of Congress prohibiting transportation in interstate commerce of goods made at a factory in which children under 14 had been permitted to work, or where those between 14 and 16 years of age had worked more than 8 hours in any one day. The bill was filed against the district attorney to enjoin him from enforcing the law, which for the first offense fixed a fine of not more than $200, and for subsequent offenses of not less than $100 nor more than $1,000, or by imprisonment for not less than 3 months, or both. The court held the act unconstitutional, and sustained the injunction, which enjoined the United States attorney from enforcing it, saying:

"The power of the states to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government."

[3, 4] It would be but a waste of time to cite further authority on this point. The Constitution (article 1, § 8) provides as follows:

Clause 1: "Congress shall have power:"
Clause 11: "To declare war."
Clause 12: "To raise and support armies."
Clause 13: "To provide and maintain a navy."
Clause 14: "To make rules for the government and regulation of the land and naval forces."
Clause 18: "To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

Congress was empowered, under section 8, to enact any law which it deemed necessary or proper to insure a successful termination of the war with Germany and its allies. Under that power acts were passed regulating the conduct of civilian individuals within military zones; disorderly houses and the sale of liquor were prohibited within those zones; the Selective Draft Law was passed; the taking over and control of the transportation systems and telegraph lines; the regulation of fuel and the necessities of life. In other words, the grant to Congress of the power to raise and support armies, considered in conjunction with the power to declare war, to make rules for the government and regulation of the land and naval forces, and to make all laws necessary and proper for the execution of the granted powers was commensurate with the emergency, and conferred upon Congress the right to do many things which in times of peace it could not have done. McKinley v. United States, 249 U. S. 397, 39 Sup. Ct. 324, 63 L. Ed. 668.

A reading of the authorities and the history of the Constitution must lead one to the conclusion that Congress had the power, in time of war, to enact legislation which could check or curb, or limit or restrict, or prevent altogether, the sale of intoxicating liquors, and that in time of peace Congress had and has no such power.

The power—the incidental power it may be called—of Congress, granted by clause 18 of section 8, so far as it relates to this case, must be liberally construed to meet every emergency or contingency definitely related to the carrying on of the war. The exercise of that power should be tested by the one question: Is what was done in the interest of the general welfare of this country and its people?

· Pursuant to the power so granted, on November 21, 1918, there was enacted by Congress, and approved by the President of the United States, what was called the War Prohibition Act, which contains the following provision:

"That after June 30, 1919, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, for the purpose of conserving the man power of the nation, and to increase efficiency in the production of arms, munitions, ships, food, and clothing for the army and navy, it shall be unlawful to sell for beverage purposes any distilled spirits,

and during said time no distilled spirits held in bond shall be removed therefrom for beverage purposes except for export. ❊ ❊ ❊

"Any person who violates any of the foregoing provisions [which includes the provision hereinabove set forth] shall be punished by imprisonment not exceeding one year, or by fine not exceeding $1,000, or by both such imprisonment and fine."

On October 19, 1919, Congress passed the so-called National Prohibition Act, and it was presented to the President of the United States for his approval. On October 27, 1919, the President vetoed that bill, returning it with his objections to the House of Representatives, where it had originated, and on the same day that House, by a two-thirds vote, resolved to pass the bill over the President's veto. The bill was likewise sent to the Senate, with the President's objections, and on October 28, 1919, that body also resolved by a two-thirds vote that the bill be passed.

Title 1 of the National Prohibition Act provides that:

"The Commissioner of Internal Revenue, his assistants, agents, and inspectors, shall investigate and report violations of the War Prohibition Act to the United States attorney for the district in which committed, who shall be charged with the duty of prosecuting, subject to the direction of the Attorney General, the offenders as in the case of other offenses against laws of the United States."

"The Commissioner of Internal Revenue, his assistants, agents, and inspectors, and all other officers of the United States whose duty it is to enforce criminal laws, shall have all the power for the enforcement of the War Prohibition Act or any provisions thereof which is conferred by law for the enforcement of existing laws relating to the manufacture or sale of intoxicating liquors under the laws of the United States."

"Any room, house, building, boat, vehicle, structure, or place of any kind where intoxicating liquor is sold, manufactured, kept for sale, or bartered in violation of the War Prohibition Act, and all intoxicating liquor and all property kept and used in maintaining such a place, is hereby declared to be a public and common nuisance, and any person who maintains or assists in maintaining such public and common nuisance shall be guilty of a misdemeanor, and upon a conviction thereof shall be fined not less than $100 nor more than $1,000, or be imprisoned for not less than thirty days or more than one year, or both."

" The United States attorney for the district where such nuisance as is defined in this act exists, or any officer designated by him or the Attorney General of the United States, may prosecute a suit in equity in the name of the United States to abate and enjoin the same."

[5, 6] Plaintiff, conceding the power in Congress to restrict the manufacture, sale, and use of distilled spirits as a war measure, contends that legislation to that end expired by limitation the moment the war emergency ceased, and further that the period of limitation expressly provided for in the acts themselves has expired. In other words, that the limit of congressional authority was the period of the war, and that Congress cannot extend that authority by its own act; that the War Prohibition Act has become obsolete, and the National Act could not operate to revive or enforce an obsolete law.

The Constitution of the United States expressly granted to the central government a right to declare war, and under the eighteenth clause of section 8, article 1, to enact any law necessary and proper to

carry into effect its legitimate ends. This is an express conferring of police power upon the United States.

The Armistice was signed on November 11, 1918. The War Prohibition Act was passed on November 21st of that same year, so that when Congress declared prohibition "during the continuance of the war, and thereafter until the termination of demobilization," it must be presumed to have had in mind the then existing conditions. The Armistice having been signed, it could not have had in mind a cessation of actual combat; and it being our duty to give force and effect to every word in a statute, where it can be done without violating the fundamental law, we must assume that the words "during the continuation of the war" meant some period between the signing of the Armistice and the final signing of a Treaty of Peace.

It is urged, however, that the use of the word "thereafter," in connection with the word "demobilization," indicates that whatever was intended with reference to "the continuance of the war" was something that must happen prior to demobilization, and that, the army and navy having been demobilized, the reason for the law has passed, and the law therefore falls of its own weight. The difficulty here lies in a too restricted definition of the word "demobilization." A great many things other than men were mobilized in this country to achieve a successful result in the war. The railroads, telephone and telegraph lines, fuel, many commodities necessary to the construction of arms and munitions, necessities of life, drugs, etc., and Congress may well have had in mind the complete reconstruction of the various things and industries of which it had taken control, and the complete assimilation of our discharged soldiers and sailors into pacific pursuits before the Prohibition Law should cease to be operative. Clearly the railroads to-day have not been demobilized; clearly they were not demobilized at the time the National Act was passed. It may be that the average citizen may not think prohibition necessary to the operation of the railroads under the control of the government, but the community and the courts are not permitted or entitled to substitute their judgment for that of Congress, when it comes to an exercise of the police power.

Certainly there has been no complete readjustment to normal peace conditions of the many private enterprises and properties taken over by the government for war purposes. As a result of our war activities and governmental control, prices of necessities of life have abnormally advanced; wages for labor have been abnormally—and perhaps necessarily so—increased; positions of employment made vacant by our soldiers and sailors have been filled, and adequately filled, by other men too old or physically unfit to fight, and by women; our millions of discharged fighters have returned to discover the cost of living doubled and a difficulty to find work; many of them unwilling, if they were permitted, to go back to their old vocations or positions; enormous profits have been made by many out of war industries, and labor is demanding its fair share in the shape of further increases in wages, until now we are amidst the greatest period of social and industrial unrest in the history of our country. These conditions which confront

us, and many others directly resulting from the war, and now surely needing regulation, may well have been the subject of congressional forecast when the War and National Prohibition Acts were passed.

Conceding, as we must, that Congress, aiming toward a successful termination of the war, had the right and power to enact a police regulation for the general welfare of all the people, the courts may not substitute their judgment for that of the legislative body as to the existence of the emergency for, or the propriety of, the legislation to that end.

"But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety." Mugler v. Kansas, 123 U. S. 623, at page 660, 8 Sup. Ct. 273, at page 296 (31 L. Ed. 205).

It is only when under the cloak of the police power the legislative body does not act in the general welfare, but proceeds arbitrarily to regulate or prohibit a trade, business, or vocation, otherwise recognized as lawful in the community, that the courts may interfere.

"It is always a judicial question if any particular regulation of such right is a valid exercise of police power, though the power of the courts to declare such regulation invalid will be exercised with the utmost caution, and only where it is clear that the ordinance or law declared void passes the limits of the police powers, and infringes upon rights guaranteed by the Constitution." Dobbins v. Los Angeles, 195 U. S. 223, at page 238, 25 Sup. Ct. 18, at page 21 (49 L. Ed. 169).

The solemn declaration of the President that the war was ended and that peace had come referred to the cessation of actual combat with the enemy and not to reconstruction at home. The statements by the Secretary of War and General Pershing that demobilization was complete referred solely to the technical discharge of the fighters from further military activity or duty. So far, therefore, as the claim is made that the acts have expired by their own terms of limitation, I disagree. The time has not yet arrived. This, therefore, makes it unnecessary to determine whether Congress could delegate to the President, or any other person, the right arbitrarily to fix the date of total or final demobilization.

As to the Fifth Amendment:

[7] It is urged that the War and National Prohibition Acts, taken together, the one overlapping the other, amount to a destroying or taking of the plaintiff's property without just compensation.

That whisky is property cannot be denied. It has been recognized as such by both state and federal courts. It has been the subject of state and federal legislation. It has been bartered and sold as an article of commerce in this country. It has been taxed by the state and

federal governments; it has been inventoried in probate courts as property, pays (indirectly) personal property taxes, inheritance taxes, excess profits taxes, and income taxes. Argument is hardly necessary to show that preventing the sale of property is substantially its destruction, so far as its pecuniary value is concerned, as value ordinarily depends upon supply and demand.

The right of Congress to pass the War and National Prohibition Acts depends upon a legitimate exercise of the police power, and while the exercise of police power often works pecuniary injury, wherever the injury is incidental of the great purpose inspiring the legislative body, the individual cannot complain and individual loss cannot be compensated for.

C., B. & Q. Railway v. Drainage Commissioners, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175, was a contest between drainage commissioners in Illinois and the railroad as to the validity of a demand made by the former that the latter should remove a bridge and culvert then maintained by it over a creek in Kendall county, Ill., or, if it continued to maintain a bridge and culvert at the same point, that one be substituted meeting the requirements of a certain plan of drainage adopted by the commissioners. It was claimed that the statute authorizing the commissioners to establish the drainage district deprived the railroad company of its property without just compensation, in violation of the Constitution. The drainage statute in question was entirely consistent with the Constitution of Illinois, and the court assumed, without discussion, that the drainage of the large body of lands so as to make them fit for human habitation and cultivation was a public purpose, to accomplish which the state might by appropriate agencies exert the general powers it possessed for the common good. The court, among other things, said:

"Upon the general subject there is no real conflict among the adjudged cases. Whatever conflict there is arises upon the question whether there has been or will be in the particular case, within the true meaning of the Constitution, a 'taking' of private property for public use. If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution. Such is the present case. There are, unquestionably, limitations upon the exercise of the police power which cannot, under any circumstances, be ignored. But the clause prohibiting the taking of private property without compensation 'is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments. It has always been held that the Legislature may make police regulations, although they may interfere with the full enjoyment of private property and though no compensation is given.'"

In L'Hote v. New Orleans, 177 U. S. 587, 20 Sup. Ct. 788, 44 L. Ed. 899, the court had under consideration an ordinance of the city of New Orleans prescribing limits in that city outside of which no woman of lewd character should dwell. Owners of property used for legitimate purposes within the district or vice zone complained that the value of their property had been destroyed, in part at least, and that

their property had been taken from them without just compensation. Mr. Justice Brewer said:

"Now, this ordinance neither prohibits absolutely nor gives entire freedom to the vocation of these women. It attempts to confine their domicile, their lives, to certain territorial limits. Upon what ground shall it be adjudged that such restriction is unjustifiable; that it is an unwarranted exercise of the police power? Is the power to control and regulate limited only as to the matter of territory? May that not be one of the wisest and safest methods of dealing with the problem? At any rate, can the power to so regulate be denied? But, given the power to limit the vocation of these persons to certain localities, and no one can question the legality of the location. The power to prescribe a limitation carries with it the power to discriminate against one citizen and in favor of another. Some must suffer by the establishment of any territorial boundaries. We do not question what is so earnestly said by counsel for plaintiffs in error in respect to the disagreeable results from the neighborhood of such houses and people; but if the power to prescribe territorial limits exists, the courts cannot say that the limits shall be other than those the legislative body prescribes. If these limits hurt the present plaintiffs in error, other limits would hurt others. But clearly the inquiry as to the reasonableness or propriety of the limits is a matter for legislative consideration, and cannot become the basis of judicial action. The ordinance is an attempt to protect a part of the citizens from the unpleasant consequences of such neighbors. Because the legislative body is unable to protect all, must it be denied the power to protect any?

"It is said that this operates to depreciate the pecuniary value of the property belonging to the plaintiffs in error, but a similar result would follow if other limits were prescribed, and therefore the power to prescribe limits could never be exercised, because, whatever the limits, it might operate to the pecuniary disadvantage of some property holders. The truth is that the exercise of the police power often works pecuniary injury, but the settled rule of this court is that the mere fact of pecuniary injury does not warrant the overthrow of legislation of a police character."

In Fertilizing Co. v. Hyde Park, 97 U. S. 659, 24 L. Ed. 1036, it appears that the General Assembly of Illinois had authorized the fertilizer company to establish a plant for the purpose of converting dead animals into an agricultural fertilizer. Pursuant to that authority the company built its factory outside the then limits of the city of Chicago and in territory adjacent to which there was little or no population. As time went on population gathered around the factory, and the character of the enterprise was such as to make it a nuisance to the neighborhood. The village of Hyde Park, which had grown up around the works of the company, passed an ordinance to suppress them, and a bill was filed in the state court to restrain the enforcement of that ordinance. The Supreme Court of the state held the ordinance valid, and the case, on claim of error, went to the Supreme Court of the United States. It was there held that, although there was a state charter authorizing the company to maintain the works, and although when established the plant was located in a territory in which there was no population, yet, when population had gathered around it, the police power of the state was sufficient to stop their operation, and that without compensation to the owners; that the pecuniary injury resulting directly to the company from the stoppage of its works and business was no bar to the exercise of the police power of the state in the interest of the general welfare of the whole people.

263 F.—39

"Laws and ordinances relating to the comfort, health, convenience, good order, and general welfare of the inhabitants are comprehensively styled 'police laws or regulations.' It is well settled that laws and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury, it is either damnum absque injuria, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure. The citizen owns his property absolutely, it is true; it cannot be taken from him for any private use whatever, without his consent, nor can it be taken for any public use without compensation; still he owns it subject to this restriction, namely, that it must be so used as not unreasonably to injure others, and that the sovereign authority may, by police regulations, so direct the use of it that it shall not prove pernicious to his neighbors, or the citizens generally." 1 Dillon, Municipal Corp. (4th Ed.) § 141.

See, also, Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205.

The Supreme Court had sustained the right of the state of Kansas to prohibit the manufacture and sale of intoxicating liquors, except for medicinal, scientific, and mechanical purposes, and to regulate the manufacture and sale thereof for such excepted purposes. If the state of Kansas, under its police power, had the right to prohibit the manufacture and sale of ardent spirits, so had each one of the other 47 states in the Union. If all of the states had the right, granting that the federal government, under the Constitution, while prosecuting the war, was entitled to exercise police power necessary and proper for the efficient carrying on of that war, there is no reason why the central government could not provide against the manufacture and sale of intoxicating liquors in all of the states, and that without compensation to the owners and dealers.

As to the Eighteenth Amendment:

[8] Does it, as urged by counsel for plaintiffs, make impotent the two Prohibition Acts? Did the several states, by its adoption, with the provision that it should not become effective "until one year from the ratification," intend to amend, restrict, or annul any of the previous grants to the national government?

This amendment is a declaration of federal policy, with provisions for its enforcement. It is also a part of our fundamental law. Its place in the framework of our Constitution is new, but not less secure than that of the original articles or the previous amendments. It has not, however, greater importance or significance by reason of being the last expression by the states to the national government. It should need no argument to demonstrate that, if clause 18 of section 8, article 1, was paramount in time of war to the rights and privileges elsewhere provided in the Constitution, the Eighteenth Amendment has no especial claim to immunity.

Congress had the power, before the Eighteenth Amendment was passed, to make police regulations in aid of the war. That amendment certainly did not destroy that right. If the amendment had been passed in January, 1917, with the one year of grace for the liquor interests to readjust themselves and their businesses, could any one in reason

contend that Congress had not the power in April, 1917, to prohibit the manufacture, sale, or even use of ardent spirits? I cannot agree with the decision of Judge Brown, in Rhode Island, that the Eighteenth Amendment necessitates the declaring of the War and National Prohibition Acts unconstitutional.

[**9, 10**] Plaintiffs urge that, even if we conclude the laws involved are valid, we should stay the hand of the government pending appeal. If individual loss, incidental to a proper exercise of the police power of the government, is not to be compensated for, this court knows of no reason why the plaintiffs should have a temporary injunction pending appeal. What Congress has done is in the interest of public welfare and public morals. If plaintiffs, not entitled to compensation, the prohibition laws being valid, may sell and distribute their product among the people of the country, the damage to the general welfare has been done, and never can be undone. If the action of Congress was wise, and so we must assume it to be, believing the Prohibition Acts to be lawful, even were the questions here involved doubtful, we would have to resolve the doubt in favor of the government.

The motion for preliminary injunction will be denied, and the motion to dismiss the bill will prevail; and it is so ordered.